RICHARD CABRNOSH, by his next friend, VACLAV CABRNOSH, Appellant, v. PENICK & FORD, Ltd., Inc. et al., Appellees.

No. 41929.

DECEMBER 12, 1933.

REHEARING DENIED NOVEMBER 22, 1934.

Jos. Mekota and Donnelly, Lynch, Anderson & Lynch, for appellant.

Grimm, Elliott, Shuttleworth & Ingersoll, for appellees.

EVANS, J.—On Sunday, June 28, 1931, Richard Cabrnosh in company with an older brother, visited the public dump of the city of Cedar Rapids. In walking over the refuse matter there dumped, he received burns to his feet and legs, and thereby sustained very serious injuries. It was alleged in the petition that the child came in contact with certain "yellowish clay-like substance", which contained some kind of acid, and that such material had been negli-

gently placed there by the defendants. It is .asserted that the so-called "yellow substance" was deposited about two weeks prior to the accident. The defendant Mims is an employee of the defendant Penick & Ford. Whatever was done, was so done by defendant Mims as an employee. We infer from the record that the defendant Penick & Ford own and operate a factory, which is referred to in the record as a starch factory. It appears that many years ago the city of Cedar Rapids established a public dump for the use of the city and of all its inhabitants. This dump is located between the Cedar River and a country road known as the Otis road. The river runs south and east and the road runs parallel with it. The space between the road and the river is about 300 feet. The entire area is devoted to the dump. The dump is in charge of the health department of the city, and is serviced by two employees. Substantially all the factories in the city and as many of the inhabitants as so desire avail themselves of the use of the dump for disposition of all manner of refuse. Prior to the time of the accident, the defendant Penick & Ford were delivering as high as forty truckloads a day of refuse. Other users used the dump likewise to the extent of their necessities. This refuse consists of all manner of material —hard and soft. A large part of the material thus delivered there is combustible; and much of it is not. The employees of the city in charge of the dump seek to distribute the deliveries so as to maintain a uniform level. The area of the dump is steadily growing larger and extends down the river. Fires are burning there constantly night and day. Noncombustible material is often used as a cover for the fires and as a restraint upon them. Underneath these covers, the fires smoulder. The following quotation from the testimony of Marsh, the principal witness for the plaintiff, is descriptive of the dump:

"I have been familiar with this dump for about 12 years. During all of this time it has been a place maintained by the City of Cedar Rapids for the purpose of providing a place for the deposit of refuse material by people, and firms and corporations in the city. The city has two employees in charge of the dump. The dump during all of the time that I have seen it has been gradually increasing in size. Lately the city employees who were down there in charge of the dump endeavored to secure distribution of the refuse material so that it will make a uniform fill along there. They haven't done this

as much previously as they have in the last year. At times they have given directions that refuse material should be dumped one place and at other times another, and other times another in connection with the gradual and uniform filling out of that dump ground. That condition has existed ever since I have been familiar with the dump more or less. The dump has extended down the river as the fill increased. The men in charge of the dump in connection with that gradual fill that has been going on there would have all material deposited over on the river bank, and then as it was gradually filled in they filled over closer to the road and when they got as close to the road as they could without encroaching unduly upon the road they would go on farther south by the river bank and re-commence that process of filling in. In that way it has been extended considerably south down the river from the original dump when I first knew it. That is one of the duties that has been performed by these employees in charge of the dump on behalf of the city.

"I know something of fires burning down there on the dump. During all of the 12 years I have known the dump, there have been fires there practically all of the time with the exception of once. Sometimes the fires are blazing and sometimes smouldering. I have seen the men in charge of the dump repeatedly deposit materials to smoulder down the flames when the wind was in the south. I never made an investigation after the material had been deposited on the surface to smoulder the flames; did not see how much fire there was smouldering underneath the place. I never investigated to see whether the consuming process of fire continued underneath the surface after the flames had been smothered. I wasn't paying as much attention to that as I was to the material of the Penick & Ford brought down. That was the matter I was chiefly concerned with at that time, and is the matter to which I directed by chief attention. There was a lot of inflammable materials in the dump, a lot of oat hulls, straw and wood and rags and grease and all that sort of thing. I have seen other trucks besides the Penick & Ford truck down there. I have seen the Quaker Oats truck with sweepings, oat hulls, straw and things of that kind and waste paper. I have seen the same thing from the Three Minute Cereal Company. I have seen quantities of rags, cans, grease, bottles and paper brought down there. There are so much rags and paper brought down in that material some of the people down there go in and pick that stuff

out and sell it again. That is going on constantly. Some of the people who frequent that dump set the brush afire. That doesn't ignite the dump at that point. The brush is put on top of the dump where there hadn't been no fire. It doesn't result in fires being started along the bank because it is far enough away from the bank it wouldn't catch. People on the dump sorting out material start fires that result in a portion of the dump being burned. Fires exist particularly along the edges of the dump where the air can get to it. The edges of the dump would be burning or smouldering today in several places, and that condition has existed ever since I have known the dump."

It was the theory of the defense on the trial that the injuries to the plaintiff resulted from contact with one of the fires of the dump. On the other hand, it was the contention for the plaintiff that the material deposited by the defendant upon the dump contained acid, and that said acid was a "yellowish matted substance" which, when left in piles and exposed to the air, "spontaneously ignites and burns at an intense heat for many days". Such is the allegation of the petition. To quote further from the petition:

"That in dumping said materials in large piles on said premises it was known to defendants that said materials would ignite and burn in such a manner that from outward appearances there was no evidence of heat or fire, but that underneath the apparent lifeless coat of gray ashes an intense fire would burn for many days; that defendants knew or should have known of the dangerous and combustible character of said material and of the effect of the acid coming in contact with the persons who would step into or against said material."

There was no other identification of the "yellowish matted substance" nor was there any proof offered that such substance would spontaneously ignite and burn other material. The final contention of the appellant is that the yellow substance, whatever its identity, did cause the plaintiff's injury, and that such injury consisted of an *acid burn*. We will consider the appeal first, upon the assumption that the injury to the plaintiff resulted from an acid burn, and that such acid substance was included in the refuse deposited in the dump by the defendants. On such assumption, has the plaintiff shown negligence on the part of the defendants?

I. The appellant disclaims any reliance upon the theory that this dump was an attractive nuisance. This is in accord with our previous holding in Smith v. Illinois Central Railway Co., 177 Iowa 243, 158 N. W. 546, L. R. A. 1917F, 1033. In that case the action was brought against the owner of the dump, which had the exclusive control thereof. As here, fires were constantly burning therein. The trial court directed a verdict therein and we sustained it here. A like holding was had in Dehanitz v. City of St. Paul, 73 Minn. 385, 76 N. W. 48; and likewise in Kohler v. Jennison, 128 Minn. 133, 150 N. W. 235; to the same effect in Richards v. Connell, 45 Neb. 467, 63 N. W. 915; and Union Stock Yards v. Rourke, 10 Ill. App. 474. In each of these latter cases the action was brought against the owner and manager of the property.

In the case at bar, the action is not brought against the owner of the dump, but against a mere patron, who has no control over his refuse after he has left it at the dump. The burden is upon the plaintiff to show that the defendant violated some duty owing to the plaintiff in bringing his refuse to the dump or that he afterwards failed in some duty to the plaintiff in the control and management of such refuse after it came to the dump. The argument for appellant does not differentiate as between the right of the defendant to deposit his refuse at the dump and his asserted duty thereafter to protect all persons against contact with such deposit.

Without doubt the city had the right to establish and to own the dump. The defendant had an equal right to avail himself of the privileges offered by the city. It necessarily follows that refuse at the dump must either decompose chemically or be consumed by fire in so far as it is combustible. There is a degree of danger incidental both to combustion and to decomposition. Decomposition involves chemical changes, which may produce acid on the one hand or neutralize it on the other. It is a general principle, as old as the common law, that, where dangerous instrumentalities are created or permitted to arise upon premises that may be frequented by invitees or perhaps licensees, liability therefor, if any, attaches to him who owns or controls the premises. The defendant had the undoubted right to accept the invitation of the city as a patron of the city dump. After the deposit, he had no control or right of management of the material dumped. There was therefore no duty upon the defendant to erect fences or guards against approach to the material. His deposit went into a common mixture, which came

from hundreds of sources. Title to the material thus deposited passed at once from the patron to the city, and the defendant became a stranger thereto. Such is the uniform holding of the cases and nothing to the contrary is cited by the appellant. This principle is stated in 20 R. C. L. 73, as follows:

"As a general rule, however, liability for injuries caused by dangerous instrumentalities terminates with a cessation of control thereover; and the liability of a landowner, likewise, is terminated when he parts with possession of the premises in question. Thereafter he is not accountable at the suit of one who may have sustained injuries while on the property. Responsibility rests upon the purchaser or other person who is substituted with respect to the control over the property."

In Mercer v. Meinel, 290 Ill. 395, 125 N. E. 288, 8 A. L. R. 351, the defendant was sued for negligence resulting in the death of plaintiff's intestate. He was charged with the negligent installation of a gas heater, which caused the death. At the time of the installation he was the owner of the premises on which the installation was made. Before the injury resulted, he had sold the premises, and he was not thereafter in control thereof. It was held that, from and after the time of the sale of the premises, his responsibility ceased, and that the grantee of the premises was thereafter responsible for their condition. We held to the same effect in Upp v. Darner, 150 Iowa 403, 130 N. W. 409, 32 L. R. A. (N. S.) 743, Ann. Cas. 1912D 574. The defendant in that case had inclosed his premises with a barbed wire fence, which was in violation of an existing ordinance. The plaintiff's horse was killed in contact with such barbed wire fence. Before the injury, the defendant had sold the premises and surrendered control thereof. We held that he was no longer responsible for the condition of the premises. In that case we said:

"But after the owner of such premises has disposed of them he is no longer liable for what may happen thereon for the reason that he is in no position to control the use thereof, and his duty to persons who may be invited there by another is at an end. The purchaser who invites the guest or visitor upon the premises then owes a duty to the person invited, and the person so invited is a stranger to the original owner.

"It is for this reason that plaintiff admits defendant cannot be held for nuisance. But he contends that an action for negligence

will lie upon the same state of facts. Here again, however, there must be found a duty upon the part of the defendant to the person who suffered the injury. * * *

"After he sold it, he had no control over the use of the property and was under no duty to one who was invited thereon by his grantee. This grantee had no authority to extend the invitation for him, and the plaintiff under the facts in this case was a stranger to the defendant; defendant owing him no duty whatever. Moreover, defendant could not, after sale, go upon the property to tear down the barbed wire. This was for his grantee to do if he saw fit, and if he neglected to do so to become responsible to any one whom he invited upon the premises and who was injured by his want of care or through failure to abate the nuisance. * * *

"'After defendant sold his property, he was no longer under any duty to persons who might be invited upon the premises by his grantee for the reason that he had no control over such grantee, could not dictate as to who should be invited or kept off the premises, and could not have removed the fence even had he been so disposed."

From an English case, cited by the appellee, Johnstone v. Lochgelly Magistrates, S. C. 1078; 50 Scot. L. R. 907; 2 Scot. L. T. 190, we quote:

"There is nothing per se dangerous about putting down waste paper. The danger, on the pursuer's averment, was, or may have been caused solely by the act of the third party for whom the defendants were not responsible. There could be no duty on their part to have a watchman constantly on duty to see that somebody did not light the paper or to see that, if they did, the fires were extinguished. Nor was there any duty on the defendants Carter who, it was said, were aware that the fire was burning, after it had been lit by someone else not connected with the defendants."

The foregoing case involved a dump.

From Smith v. Jacob Dold Packing Co., 82 Mo. App. 9, 3 L. R. A. (N. S.) 151, we quote the following discussion:

"It seems to us that the plaintiff has wholly failed to establish a right of recovery. The defendant was at the time only exercising the right to deposit its cinders and ashes on private property—at a place where the plaintiff had no right to be, where he was an in-

truder, and to whom the defendant owed no duty, except not to intentionally or wantonly injure the plaintiff. And as to the pond, the alleged attraction, the defendant was in no way responsible, since it neither created nor maintained it. But if it had done so, still, under the cases above cited, said pond is not to be treated as an attractive danger within the meaning of the 'turntable cases'. Neither can defendant be held for setting a trap to catch boys or other intruders for there is no pretense that there was any such intention when the ashes and cinders were dumped on said private grounds. The doctrine which holds one responsible for spring guns, dead falls, man-traps and the like has no application to the facts in this case."

Assuming it to be true that the refuse delivered by the defendant contained acid, yet it does not appear that his was the only refuse which contained acid. Automobile batteries were included in the refuse of other people. It is not made to appear herein whether the acid attributable to the defendant was produced by later decomposition or whether it was created in advance of the deposit. We think it must be held that the defendant was guilty of no negligence in accepting from the city the privilege of the dump for the refuse of its factory; and that upon delivery of such refuse to the city dump and to the employees in charge thereof, it lost all ownership and control over the refuse and was under no further duty in reference thereto. Two weeks had transpired since the refuse was deposited. If it resulted in chemical changes and spontaneous combustion, as asserted in the petition, this added nothing new to the conditions prevailing in the dump, the fires of which were always burning. This is not a case of explosives or of spring guns, or of traps.

II. It is urged, however, that the defendants violated the instructions of the public authorities. Plaintiff's witness, Marsh, testified that he had heard the employee of the city instruct Mims, the employee of the principal defendant, to deliver his load upon the river bank. As a matter of fact the load, which is said to contain the "yellowish matted substance", was delivered within eight feet of the Otis road. The claim is that, by violating the instructions of the public employee, the defendant was negligent. What the evidence shows is that, in an attempt to maintain uniformity in the general level of the dump, and to build it up progressively, the employees

followed a plan of beginning a swath at the river bank and working north to the road, and that upon hundreds of occasions they had directed trucks to the place of their unloading. To this statement should be added that the witness Marsh contends that reference was made in the instruction to the deposit of this particular substance. The fact remains that the deposit of this load within eight feet of the road had no causal effect as to the injury. The child was not drawn from the road to the place of accident. He came with his older brother with some refuse for dumping. He himself carried two cans. His brother carried refuse in a pail. When they got to the dump, they proceeded to the bank of the river and emptied their refuse on the bank. They remained at the dump for more than an hour. It was in passing out of the dump and into the road that the boy passed over the place of the accident. The fact, therefore, that the place of the accident was near the road had no causal effect upon the accident itself.

III. Up to this point we have assumed the facts as being in accord with the plaintiff's theory. The query remains whether the plaintiff introduced sufficient evidence to justify the jury in finding the facts as thus contended by the appellant. At its vital points the case rests upon the testimony of one witness. This was Marsh, a so-called "dump picker". His evidence is vulnerable. It is inconsistent in some respects and likewise self-conflicting. We may grant that inconsistency would be subject to the consideration of the jury, and perhaps the self-conflicting. But at some points this witness testified to the impossible. The only description or identification of the yellow substance asserted was the testimony of this witness. He described it as follows:

"That yellow material was kind of sticky and bites your hands when you touch it; there was brass screws in the wood, and we would take the wood and split it in order to get the screws, and it would bite your hands if you had any sores or scratches on your hands. I got into this stuff for the purpose of getting the brass screws out of the wood that was in it. Several times I had sores or scratches on my hands and I would get that on it and there was no medicine that would stop it; it would just eat until it 'et' to the bone and start healing out; my hands are cracked now from it; you can't heal them up from it. If you had any cuts on your hands it just smarted like putting iodine on a raw sore. Until they start to heal up the sore itself would be kind of black."

The only evidence in the record concerning the potent character of this mythical substance was its effect upon the hands of this witness. He does not claim that his injuries were ever submitted to the consideration of a doctor. He does not claim that he ever desisted from picking screws out of this material. His contention that it "et to the bone" and that "no medicine would stop it" may be classed as expert opinion by a non-expert witness. The witness, Keyes, was another "dump picker". He testified that he saw the yellow matter. He did not testify as to having received any hurt from it. As compared with the hurt suffered by the witness, Marsh, we may note the immediate injuries inflicted upon the boy. Marsh was present at the time of the accident. He testified as follows:

"He started to run over toward the edge of the bank in a northeast direction towards Otis Road. His brother George was just coming from the well with water and that was the general direction Richard was going at the time. Richard was half running, faster than a walk. He got his hands into the stuff. He went right in running when he fell into it, his hands went into it, too. He fell forward.

"I have seen this yellowish substance dumped off of the Penick & Ford truck at this point about two weeks before the accident. When I saw Richard running in the direction I have told about this substance appeared to have white ash on top, just like dead ashes. There was not a bit of smoke. There was no flame. It had been in that condition for three days that I know of for sure. This was about 15 feet from the place where Mims dumped the stuff that morning. You couldn't dump right there off the Otis Road, you had to pull in the dump a-ways and back up to that corner. As soon as I saw Richard had fallen into this substance I grabbed hold of the boy and rolled him in the dust of the road *to put the sparks out in his clothes.* I found at that time that he had been burned. The skin was hanging from his hands and from his feet. I didn't pull his overalls up to see how his legs was burned, but the skin was hanging from his legs, and they was bleeding, blood all over the bottom of my car. His overalls were down at this time. He was barefoot."

It appears that a short time after the accident the mother presented a verified claim to the city. The claim was prepared by her attorney and purported to recite the facts. This statement included

the following: "Richard fell into a hole that was full of fire and both his lower extremities have been severely burned." The evidence for the plaintiff on the trial negatived the idea that the child had been burned by fire. One of the attending physicians testified that the burn was an *acid burn*. He would not express an opinion as to the kind of acid other than that it was *not sulphuric acid*. Manifestly if it were a fire burn there would be no way to distinguish the fire of the defendant from the fire of other depositors. But the effort to negative the idea of a fire burn rendered the evidence on behalf of plaintiff quite inconsistent at various points. There was no other identification or description of the alleged yellow substance than is contained in the nonexpert testimony of Marsh. The only description that Marsh could give of the same was that it burned his sores like iodine. If this material could have been identified (and according to Marsh there had been no lack of opportunity for such identification), expert testimony could have advised us what its potency was and whether it was capable within a few moments of so great an injury as was inflicted on the boy. If it had such potency, then an important circumstance would be added in support of the theory that the injury was the result of this yellow substance. If it had not such potency, this would refute the theory. But there is no testimony on that subject. Instead of proving that the injury of the child could have been caused by the yellow substance, the testimony of Marsh was that the injury *was caused* by such substance. This was a mere opinion on his part. If he had dug down through the covering through which the boy fell he might have discovered the smouldering of the fire there. He did nothing of that kind. Surely, if he had found fire there, it would be persuasive evidence, if not conclusive, that the burn was caused by the fire. The question at this point therefore resolves itself to this: Can the opinion of Marsh be accepted as proof that the injuries suffered by the boy were caused by the yellow substance, and not by fire underneath it? The testimony at this point was purely circumstantial, and the burden was upon the plaintiff to negative every other reasonable hypothesis. This feature of the case is met in appellant's brief by the following statement:

"Whether the plaintiff received his injuries solely from acid or solely from fire is a matter which of course this six year old boy would be at a loss to explain. The testimony of the witness who

pulled the boy from this mass of material would indicate that the injuries were the result of extreme heat. The testimony of the doctor would indicate that the injuries were the result of acids of a most potent character. What as between these two witnesses the jury might find caused these injuries is a matter upon which the Court refused to permit them to determine. The material containing properties which would cause injury both by eating and burning the reasonable inference is that *both agencies* combine to produce such injuries."

The answer to the foregoing is that the only evidence that the yellow substance caused the injury was the fact of the injury itself. It was incumbent upon plaintiff, therefore, to prove the absence of fire from the hole into which the boy fell. If in fact fire had been present there, it would leave the record without any proof that the yellow substance was the cause of the injury.

We reach the conclusion that the district court properly directed a verdict.—Affirmed.

ALBERT, C. J., and KINDIG, CLAUSSEN, and DONEGAN, JJ., concur.